# EXHIBIT 1

**Melissa Russo**

---------- Forwarded message ---------
From: **chart_cm** <chart@commixtio.com>
Date: Wed, 2 Dec 2020 at 21:16
Subject: ocean force/CAC
To:

COMMIXTIO LTD, ODESSA

to owners
to chrts

clean fixture recap asf

c/p dated 02/12/20

mv Ocean Force as below short description
MPP/ROLO
Class GL 100 A5 E / Flag Belize
Blt 06-1983 at HUSUMER KROEGER in Germany
DWT abt 4,555 mts on 4.83 mSSW
1 Ho/Ha - Bl 10,487 m3
GT/NT 6,705/2,011
LOA/LBP/BM/DM 106.11/99.65/19.60/10.95 m
MAK (6M453AK) 2x1470 kW 12.3 Kn
Shaft gen / Bow thruster
Cr 2x63 ts
straight stern ramp cap 600 mt
ada wog

vessel not to be used for semi-sub operation
full tc description is attached
vessel will carry some containers with owners eqiupment on board which will
reduce vessels' intake according

- dwt scale and ship's certificates as attached
- vsl can trade fully burning MGO

1

- owrs to confirm vsl is full IACS and full P&I covered and will remain during tc period

for

acct : CAC Maritime, Ltd.
based in Panama and have been in business
since 2009.  (please insert full style)

Last fixtures : mv Melina (Onego)
              mv Beauforte (Onego)
              mv Tide Navigator (Schulte & Bruns)
- Chrts main trading Fall River MA and NY to St. Marc Haiti, and bunkers
will be supplied in US from following bunker supplier :

Luzo Fuel
luzofuel.com
126 Macarthur Dr, New Bedford, MA 02740
(508) 996-8042
Attn : Carlos

Chrts are not planning of having long term bunker credits.  Chrts to
provide to owrs every time bunkers replenish bunkers order and payment
confirmation.

- t/c  period : 3 months + 3 months in chopt to be declared 15 prior
expiration last period
in case no declaration from charterers side cp to be considered
automaticaly extended
- - vessels trading area limited with
USEC/USG/CARIBS/ECCA/NCSA/WCCA/USWC/WCSA  except war risk areas within
INL/IWL limits and excl  areas may potentially put vessel/owner under
sanctions. st lawrence/great lakes is excluded.  VENEZUELLLA AND CUBA  and
cape horn transit TO BE EXCLUDED
any other areas are ok subject to owners reconfirmation not be unreasonably
withheld
- vsl to be able to trade to full operational capabilities as far as
stability/trim/certificates and local rules permits
- hire : usd 6,100 pdpr
- hire to be paid every 15 days
- first hire 15 days to be paid in advance on clean fixture
- delivery : DLOSP Wilmington Delaware USA
- laycan Dec 13-15
- redely DLOSP  USEC/Caribs/USG in chrts options excl. Cuba
-  chrts  to  be able use of all lashing and lifting material as on
board and as per attached lashing invenoty list
-  bunkers : chrts to redeliver vsl with same amount of bunkers as on
delivery.
- expected BOD bod 130-170 mts LS MGO 0.1%
-  charterers do not pay for bunker on delivery but they are obliged
to  stem  their bunker in Fall Rivers where the ship will proceed for
loading  adter delivery DOP Wolmington, DE. such porcedure is accpetd

by owners provided:

1/ 1st hire is fully paid in advance and

2/ owners are entitled to temrminate the charter party and reimburse
all their damages if chrts fail to stem thier bunker in Fall River and

3/ vessel allways keep on board at least 100 mt of MGO which is
belongs to owners and are not allowed for chrts' use (as far as chrts
never paid for it)

- crew to perform any necessary lashing/welding jobs during charter
period with bonus negotiated with master case by case.

- vessel will carry some containers with owners eqiupment on board
which will reduce vessels' intake accordingy ( see aatched exepcted
stow of owners' cargo)

- otherwise as per owns' executed t/c party as attached

- Arbitration In London/ english law to aplly

- bimco clauses to be fully incorporated into cp:

2020 marine fuel sulphur content clauses to time charter parties

BIMCO Canadaian Advance Cargo Notification Clause for Liner Bills of Lading
Law and Arbitration Clause 2020 London

War Risks Clause for Time Chartering 2013 (CONWARTIME 2013)

Infectious or Contagious Diseases Clause for Time Charter Parties 2015

Ice Clause for Time Charter Parties 2005

COVID-19 Crew Change Clause for Time Charter Parties 2020 (full hire to
apply)

- 1.25 pct comm here
END

owners will revert with amended hire invoice.

chrts - pls advise to whom notices to be given.

thanks for this fixture.

Best Regards
Sergey Dudnik
as agent only

dir.+380 482 307774
mob.+380 503161556

--
Victor Puyu
Chartering Department
projects@primetransportltd.com (for projects)
Direct: +380 487 579 155
Mobile: +380 503 361 744
skype: victor.p2005
www.primetransportltd.com
as agents only

## SHIP'S PARTICULARS

| | | | | | |
|---|---|---|---|---|---|
| Name: | Ocean Force | | Owner: | Redbrick Ventures Ltd., | |
| Call sign: | V3WI7 | | | Drake Cambers,Road Town, | |
| Built: | Husum, 1983 | | | Tortola, BVI. | |
| Yard No.: | 1482 Husumer Schiffswerft | | | | |
| Flag/Port of registry | Belize/Belize City | | | | |
| Official No.: | 731482 | | | | |
| IMO No.: | 8215613 | | | | |
| GL No.: | 30398 | | | | |
| MMSI No.: | 312666000 | | | | |
| INM-C No.: | 431266611/431266610 | | Freeboard from deck line(H/C CLOSED): | | |
| FBB-500 Voice No.: | 870-773-186861 | | Tropical: 1205mm  Deck line=6,02m | | |
| FBB-500 Fax No.: | 870-761-134328 | | Summer: 1205mm  FW Allowance=100mm | | |
| | | | Winter: 1205mm | Summer draft: 4,82m | |
| E-Mail | oceanforce@skyfile.com | | WNA: 1205mm | | |
| Class: | Ro-Ro ship, Semi-submersible | | | | |
| | equipped for Containers | | Freeboard from deck line(H/C OPENED): | | |
| Classification : | Germanischer Lloyd;+100 A5 | | Tropical: 2415mm  Deck line=6,02m | | |
| | SUEZ    PANAMA | | Summer: 2490mm  FW Allowance=75mm | | |
| GRT: 6705 | 6796,71 | 6962 | Winter: 2565mm | Summer draft: 3,53m | |
| NRT: 2011 | 6051,38 | 6107 | WNA: 2615mm | | |
| DWT: 4374 | Open sky: | 2030 | | | |
| LOA: 106,11 | LBP: 99,65m | | | | |
| Breadth: | 19,6 BOA: 20,42m | | | | |
| Moulded depth: | 10,95m | | Tanks capacities | | |
| Summer draft: | 4,82 Open sky: 3,53 | | IFO: 462mts | FW: | 98mts |
| Light ship: | 2979 w/o h/covers: 2725 | | MGO: 58mts | BW: | 7195mts |
| Air draft above keel: | 35,00m | | To radar mast: | 31,75m | |
| Depth(CGO DECK): | 5,01m | | Upper deck: | 10,95m | |
| Holds/hatches: | 1.1 | | Hold cubic breakdown | 370.000cbf bale | 10,487cbm |
| Hatch type: | Single box | | Container capacity: | 452TEU(see remark) | |
| H/covers type: | MACOR, PICK-A-PACK system | | Hold: | 228TEU(w/o stack cones) | |
| | | | Upper deck: | 224TEU | 25/40mts |
| Hold dimensions(LxBxH) | | | | | |
| Garage deck: | 85,5x14,92x7,80m | | | | |
| | | | Cranes | 2 x 63 t | on starboard side |
| Upper deck: | 86,60x15,00m | | | | |
| Hatch covers (LxBxH) | | | | | |
| HC No.1 | 12,90x15,00x0,90m | | Weight: | 38mt | |
| HC No. 2,3,4,5,6: | 12,54x15,00x0,90m | | Weight: | 36,8mt | Total weight: 254mt |
| HC No.7 | 10,67x15,00x0,90m | | Weight: | 32mt | |
| | | | Weight: | | Total weight: |
| Deck strength: | | | Stackweight contaner 20'/40': | | |
| Garage= | 10,00t/m | | 60/90tons | | |
| Tween deck= | | | | | |
| Upper deck= | 1,27t/m | | 25/40tons | | |
| Engine: | MAK 6M 453AK- 1470kW x 2 | | no ponton tween deck on board | | |
| Bow truster: | 300kW | | vessel can carry 2-3 teu with own equipment | | |
| Generators: | 130kW x 2 | | | | |
| Shaft generator: | 300kW | | | | |

speed abt 10 kn on abt 10 mts MGO LS.
Eco speed abt 6kn on 5 mts MGO LS (eco sped wog, using one M/E  Port idle consumption 1 mts mgo.
with one crane working 16 hours 1,5 mts mgo, 2 cranes working 16 hours 3 mts mgo
vessel burns mgo whn manoevering/navigation in confined waters/rivers/estauries/canals
and in/out of ports or when swell does not allow to use shaft gens
        The aforementioned speed and consumption warranties are applicable only on "good weather days"
of wind force not exceeding force 2 of Beaufort scale and sea state conditions not exceeding force 2
of Douglas scale free of adverse swell and adverse current. It is understood that the above speed /
consumption warranties are not applicable during bad weather days
 No extrapolation ofperformance calculations to be made for bad weather period

vessel have no container shoes in low hold, so any containers loaded under deck shall be
secured as usual general cargo. Container lashing as on board for part of the container intake

container intake subject trim stability stackweight and always less than nominal intake

final bunker intake is upto master descretion but always upto max 90% of max intake
fuel supplyed by the charterers shall comply with iso 8217 -2010 specs
all details about given in good faith but without guarantee

| Ship Brokers | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) |
|---|---|
| **Parimar Brokers** | **GENERAL TIME CHARTER PARTY** |
| **21 bis rue du Maréchal Gallieni** | **CODE NAME: "GENTIME"**                    **PART I** |
| **78 000 Versailles - France** | |

**Printed by BIMCO's idea** (vertical left margin)

**Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen Issued: September 1999** (vertical left margin)

| | |
|---|---|
| Ship Brokers<br>**Parimar Brokers**<br>**21 bis rue du Maréchal Gallieni**<br>**78 000 Versailles - France**<br>and<br>**Co-Shipping GmbH**<br>**Ansorgestrasse 13**<br>**22 605 Hamburg - Germany** | **1. Place and Date of Charter**<br>**Versailles, 1st August 2019** |
| **2.** Owners/Disponent Owners/Place of business(State full name, address, telex and fax.No.)<br><br>**PRIMETRANSPORT COMPANY OU**<br>**HARJU MAAKOND, RAE VALD, PEETRI ALEVIK,**<br>**HELGI TEE 2-204, 75312 ESTONIJA**<br>**as disponent Owners**<br><br>**Managers : PRIMETRANSPORT LTD**<br>**DMITRY MASHKOVETS**<br>**DIR:+380 48 7579164**<br>**MOB:+380 50 3998808**<br>**SKYPE: dmashkovets**<br>**E-MAIL: operations@primetransportltd.com** | **3.** Charterers/Place of business (State full name, address, telex and fax. No.)<br><br>**AVIRON MARINE LTD -**<br>**DARTMOUTH -**<br>**Nova Scotia - Canada** |
| **4.** Vessel's Name<br><br>**MV "OCEAN FORCE"  (IMO: 731482)** | **5.** Vessel's Description<br><br>Flag: **Belize** |
| **6.** Period of Charter (Cl.1(a))<br>**3 months Time Charter Period running as from delivery** | Year Built: **1983** |
| | Class: **Germanischer Lloyd** |
| **6(a).** Margin on Final Period (Cl.1(a))<br>**N/A** | M/tons Deadweight (Summer): **4374 tons** |
| | GT/NT: **6705/2011** |
| **7.** Optional Period and Notice (Cl.1(a))<br>**in direct continuation and in Charterers' option: 3 months + 6 months - Each option to be declared by the Charterers at least 15 days before the end of the preceding firm period** | ~~Grain/Bale~~ Deck/Garage Capacity  : about 300 LM or about 210 TEU |
| **8.** Delivery Port/Place or Range (Cl.1(b))<br>**Arrival Pilot Station at Halifax** | Speed capability in knots (about): **abt 10 Knots laden** |
| **9.** Earliest Delivery Date/Time (Cl.1(c))<br>**8th August 2019 00h01 LT** | **10.** Cancellation Date/Time (Cl.1(c) (d))<br>**9th August 2019 23h59 LT** |
|  |  |

Consumption in m/tons at above speed (about): **9 MT IFO 30 at sea - Port idle consumption 1,3 mts mgo.with one crane working 16 hours 3 mts mgo, 2 cranes working 16 hours 5 mts mgo**

**vessel burns mgo whn manoeuvering/navigation in confined waters/rivers/estauries/canals**

**and in/out of ports or when swell does not allow to use shaft gens**

(Speed and Consumption on Summer dwt in good weather, max. windspeed ~~4~~ 2 Bft)

**See also description in Clause 26. About means 5 %.**

| **11.** Notices of Delivery (Cl. 1(e))<br>**N/A** | **12.** Intended ~~First~~ Cargo (Cl.1 (f))<br>**53 feet containers/rolling stock/parcel feedering service.** |
|---|---|

| **13.** Trading Limits and Excluded Countries (Cl. 2(a)) |
|---|
| **Always afloat, mostly ice free, always within IWL via good safe ports, safe berths except countries boycotted or under ban of the United Nations and/or the European Union always within Class and Flag certificates limits.**<br><br>**Trading area : EC Canada including French overseas territories of St-Pierre-et-Miquelon.**<br><br>**Intended trade and schedule : Vessel employment in charterers' liner service between Halifax and Saint-Pierre with intended frequency of 1 RV per week** |

This document is a computer generated GENTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

(continued)                    "GENTIME" General Time Charter Party                    PART I

| 14. Excepted Countries (Cl. 2(b)) |
| --- |
| **EC Canada including French overseas territories of St-Pierre-and-Miquelon provided ice free excluding st lawrence / great lakes** |

| 15.Excluded Cargoes (Cl. 3(b)) |
| --- |
| **Permissible cargoes to be always lawful and harmless to the vessel.** |
| **Maximum permitted as per vessel's certificates of compliance for the carriage of dangerous goods and in accordance with IMO/IMDG code rules and local authorities and regulations and subject to Master's approval not to be unreasonably withheld** |
| **Charterers will be allowed and free, without extra payment, to load on board the vessel IMO cargoes subject to Master's approval not to be unreasonably withheld and in accordance to IMO/IMDG code and local regulations.** |

| 16. Hazardous Cargo Limit (Cl. 3(c)) | 17. Redelivery Port/Place or Range (Cl. 4(a)) | | 18. Notices of Redelivery (Cl. 4(c)) |
| --- | --- | --- | --- |
| **see box 15 above** | **Dropping Outward Pilot one port East Coast Canada including Saint-Pierre-et-Miquelon Archipelago in Charterers' option ATDNSSHINC** | | **15/10/7/3/1 days** |

| 19. Fuel Quantity on Delivery (Cl. 6(a)) | 20. Fuel Quantity on Redelivery (Cl.6(a)) | 21. Fuel Price on Delivery (Cl. 6(c)) | 22. Fuel Price on Redelivery (Cl. 6(c)) |
| --- | --- | --- | --- |
| **(see clause 27)** | **(see clause 27)** | **(see clause 27)** | **(see clause 27)** |

| 23. Fuel Specifications (Cl. 6(d)) |
| --- |
| **The Vessel and the Owners to comply with 0.1% ECA regulations at all times.** |

| 24. Hire (Cl. 8(a)) | 25. Owner's Bank Account (Cl. 8(b)) | | |
| --- | --- | --- | --- |
| **USD 5400,- (Five thousand four hundred United States Dollars)** | | | |

| 26. Grace Period (Cl. 8(c)) | 27. Max. Period for Requisition(Cl. 9(c)) | 28. General Average Adjustment (Cl. 14(b)) | |
| --- | --- | --- | --- |
| **3 banking days** | **10 days** | **London** | |

| 29. Supercargo (Cl.15(f)) | 30. Victualling (Cl. 15(g)) | 31. Representation (Cl. 15(h)) | 32. Hold Cleaning by Crew (Cl. 15(m)) |
| --- | --- | --- | --- |
| **N/A** | **N/A** | **N/A** | **USD 1.000,- (one thousand United States Dollars)** |

| 33. Lumpsum for ~~Hold~~ **Garage** Cleaning on Redelivery (Cl. 15(m)) | 34. Vessel's Insured Value (Cl. 20(a)) |
| --- | --- |
| **Included in the hire** | **USD 1 600 000,- (one million six hundred thousand United States Dollar)** |

| 35. Law and Arbitration ( state Cl. 22(a), 22(b) or 22(c) of Cl. 22 as agreed; if 22(c) agreed, place of arbitration must be stated (Cl. 22)) | 36. Commission and to whom payable (Cl. 23) |
| --- | --- |
| **Clause 22 a** | **2.50 % (two and half percent) on hire and ballast bonus to Parimar Brokers and 2.50 % (two and half percent) on hire and ballast bonus to Co-Shipping Gmbh for division** |
| | **ie Total 5.00 % (five percent) on hire and ballast bonus.** |

| 37. Additional Clauses |
| --- |
| **Clauses 25 to 38 both inclusives** |

It is agreed that this Contract shall be performed subject to the conditions contained in this Charter Party consisting of PART I including any additional clauses agreed and stated in Box 37 and PART II as well as Appendix A attached thereto. In the event of any conflict of conditions, the provisions of PART I and Appendix A shall prevail over those of PART II to the extent of such conflict but no further.

This document is a computer generated GENTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| Signature (Owners) | Signature (Charterers) |
| --- | --- |
|  |  |



This document is a computer generated GENTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## "GENTIME" – General Time Charter Party
## Index

**1. PERIOD AND DELIVERY**
(a) Period
(b) Delivery place
(c) Delivery time
(d) Cancellation
(e) Notice(s)
( f ) Vessel´s condition
(g) Charterer´s Acceptance

**2. TRADING AREAS**
(a) Trading Limits
(b) Excepted Countries
(c) Ice

**3. CARGO- RESTRICTIONS AND EXCLUSIONS**
(a) Lawful Cargoes
(b) Excluded Cargoes
(c) Hazardous Cargoes
(d) Radioactive Cargoes
(e) Containers
(f) Deck Cargo

**4. REDELIVERY**
(a) Redelivery place
(b) Acceptance of Redelivery
(c) Notice
(d) Last Voyage

**5. ON/OFF-HIRE SURVEYS**

**6. BUNKERS**
(a) Quantity at Delivery/Redelivery
(b) Bunkering prior to Delivery and Redelivery
(c) Purchase Price
(d) Bunkering
(e) Liability

**7. VESSEL´S GEAR, CRANES, RAMPS, DOORS, AND EQUIPMENT**
(a) Regulations
(b) Breakdown of Vessel´s Gear
(c) Suez and Panama Canal
(d) Lighting

**8. HIRE**
(a) Rate
(b) Payment
(c) Default
(d) Deductions
(e) Redelivery Adjustment

**9. OFF-HIRE**
(a) Inability to Perform Services
(b) Deviation
(c) Requisitions
(d) Addition to Charter Period

**10. LOSS OF VESSEL**

**11. OWNERS' OBLIGATIONS**
(a) Wages
(b) Stores
(c) Insurance of the Vessel
(d) Crew assistance
(e) Documentation
(f) Deratisation
(g) Smuggling

**12. MASTER**

**13. CHARTERERS´ OBLIGATIONS**
(a) Voyage Expenses
(b) Bunker Fuel
(c) Agency Costs
(d) Stevedoring
(e) Advances to Master
(f) Contraband

**14. OWNERS' REQUIREMENTS**
(a) Maintenance
(b) General Average
(c) Salvage
(d) Lien

**15. CHARTERERS´ REQUIREMENTS**
(a) Plans
(b) Flag and Funnel
(c) Communications Facilities
(d) Logs
(e) Replacement of Master and Officers
(f) Supercargo
(g) Victualling
(h) Representation
(i) Sub-Letting
(j) Inspections
(k) Weather Routeing
(l) Laying up
(m) Cleaning

**16. SUNDRY MATTERS**
(a) Stowaways
(b) Stevedore Damage
(c) Fumigation
(d) Anti-drug Clause

**17. BILLS OF LADING, WAYBILLS AND OTHER CONTRACTS OF CARRIAGE**
(a) Signing Contracts of Carriage
(b) Protective Clauses
(c) Deck Cargo
(d) Defence of Claims
(e) Payment and Indemnity

**18. RESPONSIBILITIES**
(a) Cargo Claims
(b) Fines, etc.
(c) Deck Cargo
(d) Death or Personal Injury
(e) Agency
(f) Indemnity and Limitation
(g) Time Bar

**19. EXCEPTIONS**

**20. INSURANCES**
(a) Hull and Machinery
(b) Protection and Indemnity (P & I)

**21. WAR RISKS**

**22. LAW AND ARBITRATION**

This document is a computer generated GENTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"GENTIME" – General Time Charter Party
Index

23.  COMMISSION

24.  NOTICES

25. RELEASE OF CHARTER PARTY DETAILS TO THIRD PARTY

26. DESCRIPTION

27. BUNKERS ON DELIVERY AND ON REDELIVERY

28.FUEL IN TANKS

29. CARGO IMPORT-EXPORT PERMITS/TAXES AND/OR DUES

30. LASHING EQUIPMENT

31. CARGO INSIDE VEHICLES AND/OR CONTAINERS

32. FLAG

33. CERTIFICATES

34. BUNKER FUEL SULPHUR CONTENT CLAUSE

35. BUNKER QUALITY CONTROL CLAUSE

36. LIEN CLAUSE

37. CONFIRMATION OF PAYMENT D/A, BUNKER SUPPLY

38. CARGO ON BOARD AT TIME OF DELIVERY

This document is a computer generated GENTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# PART II
# "GENTIME" General Time Charter Party

It is agreed on the date shown in Box 1 between the party named in Box 2 as Owners/ 1
Disponent Owners (hereinafter called "the Owners") of the Vessel named in Box 4, of 2
the description stated in Box 5 and the party named in Box 3 as Charterers as follows: 3

**1. Period and Delivery** 4
(a) *Period* - In consideration of the hire stated in Box 24 the Owners let and the 5
Charterers hire the Vessel for the period/trip(s) stated in Box 6. 6
The Charterers shall have the option to extend the Charter Party by the period(s)/ 7
trip(s) stated in Box 7 which option shall be exercised by giving written notice to the 8
Owners on or before the date(s) stated in Box 7. 9
Unless otherwise agreed, the Charterers shall have the option to increase or to 10
reduce the final period of the Charter Party by up to the number of days stated in 11
Box 6(a), which shall be applied only to the period finally declared. 12
(b) *Delivery Place* - The Owners shall deliver the Vessel to the Charterers at the port or 13
place stated in Box 8 or a port or place within the range stated in Box 8. 14
(c) *Delivery Time* - Delivery shall take place no earlier than the date/time stated in Box 15
9 and no later than the date/time stated in Box 10. Delivery shall be effected at any 16
time day or night, Saturdays, Sundays and holidays included. 17
(d) *Cancellation* - Should the Vessel not be delivered by the date/time stated in Box 10 18
the Charterers shall have the option to cancel the Charter Party without prejudice 19
To any claims the Charterers may otherwise have on the Owners under the Charter 20
Party. If the Owners anticipate that, despite their exercise of due diligence, the 21
Vessel will not be ready for delivery by the date/time stated in Box 10, they may 22
notify the Charterers in writing, stating the anticipated new date of readiness for 23
delivery, proposing a new cancelling date/time and requiring the Charterers to 24
declare whether they will cancel or will take delivery of the Vessel. Should the 25
Charterers elect not to cancel or should they fail to reply within two (2) working 26
days (as applying at the Charterers' place of business) of receipt of such notification, 27
then unless otherwise agreed, the proposed new cancelling date/time will replace 28
the date/time stated in Box 10. This provision shall operate only once and should 29
the Vessel not be ready for delivery by the new cancelling date/time the Charterers 30
shall have the option of cancelling this Charter Party. 31
(e) *Notice(s)* - The Owners shall give the Charterers not less than the number of days 32
notice stated in Box 11 of the date/time on which the Vessel is expected to be 33
delivered and shall keep the Charterers closely advised of possible changes in the 34
Vessel's expected date/time of delivery. The Owners shall give the Charterers and/or 35
their local agents notice of delivery when the Vessel is in a position to come on hire. 36
(f) *Vessel's Condition* - On arrival at the first port or place of loading. **Upon delivery,** the 37
Vessel's holds/**weatherdeck** 38
shall be clean, **tidy, odourless** and in all respects ready to receive the intended cargo 38
identified in 38
Box 12, failing which the Vessel shall be off-hire from the time of rejection until she 39
Is deemed ready. 40
(g) *Charterers' Acceptance* - Acceptance of the Vessel by the Charterers 41
shall not prejudice their rights against the Owners under this Charter Party. 42

**2. Trading Areas** 43
(a) *Trading Limits* - The Vessel shall be employed in lawful trades within Institute Warranty 44
Limits (IWL) and within the trading limits as stated in Box 13 between safe ports, **safe** 45
**berths, safe anchorages** or 45
safe places where she can safely enter, lie always afloat, and depart. 46
(b) *Excepted Countries* - The Owners warrant that at the time of delivery the Vessel will 47
not have traded to any of the countries listed in Box 14. 48
(c) *Ice* - The Vessel shall not be required to enter or remain in any icebound port or 49
area, nor any port or area where lights, lightships, markers or buoys have been or 50
are about to be withdrawn by reason of ice, nor where on account of ice there is risk 51
that, in the ordinary course of events, the Vessel will not be able safely to enter and 52
remain in the port or area or to depart after completion of loading or discharging. 53
The Vessel shall not be obliged to force ice but, subject to the Owners' prior approval, 54
may follow ice-breakers when reasonably required, with due regard to her size, 55
construction and class. If, on account of ice, the Master considers it dangerous to 56
remain at the port or place of loading or discharging for fear of the Vessel being 57
frozen in and/or damaged he shall be at liberty to sail to any convenient place and 58
there await the Charterers' new instructions. 59

**3. Cargo - Restrictions and Exclusions** 60
(a) *Lawful Cargoes* - The Vessel shall be employed in carrying lawful cargo. Cargo of 61
a hazardous, injurious, or noxious nature or IMO-classified cargo shall not be carried 62
without the Owners' prior consent in which case it shall be carried only in accordance 63
with the provisions of sub-clause (c) of this Clause. 64
(b) *Excluded Cargoes* - Without prejudice to the generality of the foregoing, the following 65
Cargoes shall be excluded: livestock, arms, ammunition, explosives, nuclear and 66
radioactive material other than radio-isotopes as described in sub-clause (d) of this 67
clause and any other cargoes enumerated in Box 15. 68
(c) *Hazardous Cargoes* - If the Owners agree that the Charterers may carry hazardous, 69
Injurious, noxious or IMO-classified cargo, the amount of such cargo shall be limited 70
To the quantity indicated in Box 16 and the Charterers shall provide the Master with 71
evidence that the cargo has been packed, labelled and documented and shall be 72
loaded and stowed in accordance with IMO regulations, any mandatory local 73
requirements and regulations and/or recommendations of the competent authorities 74
of the country of the Vessel's registry. Failure to observe the foregoing shall entitle 75
the Master to refuse such cargo or, if already loaded, to discharge it in the Charterers' 76
time and at their risk and expense. 77

(d) *Radio-active Cargoes* - Radio-isotopes, used or intended to be used for industrial, 78
commercial, agricultural, medical or scientific purposes, may be carried subject to 79
prior consent by the Owners and the Master, provided that they are not of such a 80
category as to invalidate the Vessel's P & I cover. 81
(e) *Containers* - If cargo is carried in ISO-containers such containers shall comply with 82
the International Convention for Safe Containers. 83
(f) *Deck Cargo* - Subject to the Master's prior approval, which shall not be unreasonably 84
withheld, cargo may be carried on deck in accordance with the provisions of Clauses 85
17 (c) and 18. 86

**4. Redelivery** 87
(a) *Redelivery Place* —, The Charterers shall redeliver the Vessel to the Owners at 88
the port or place stated in Box 17 or a port or place within the range stated in Box 17, 89
in the same order and condition as when the Vessel was delivered, fair wear and 90
tear excepted. 91
(b) *Acceptance of Redelivery* - Acceptance of redelivery of the Vessel by the Owners 92
Shall not prejudice their rights against the Charterers under this Charter Party. 93
(c) *Notice* —The Charterers shall give the Owners not less than the number of days 94
notice stated in Box 18 indicating the port or place of redelivery and the expected 95
date on which the Vessel is to be ready for redelivery. 96
(d) *Last Voyage* - The Charterers warrant that they will not order the Vessel to commence 97
a voyage (including any proceeding ballast voyage) which cannot reasonably be 98
expected to be completed in time to allow redelivery of the Vessel within the period 99
agreed and declared as per Clause 1(a). If, nevertheless, such an order is given, the 100
Owners shall have the option: (i) to refuse the order and require a substitute order 101
allowing timely redelivery; or (ii) to perform the order without prejudice to their rights 102
to claim damages for breach of charter in case of late redelivery. In any event, for 103
the number of days by which the period agreed and declared as per Clause 1(a) is 104
exceeded, the Charterers shall pay the market rate if this is higher than the rate 105
stated in Box 24. 106

**5. On/Off-hire Surveys** 107
Joint on-hire and off-hire surveys shall be conducted by mutually acceptable surveyors 108
at ports or places to be agreed. The on-hire survey shall be conducted without loss of 109
time to the Charterers, whereas the off-hire survey shall be conducted in the Charterers' 110
time. Survey fees and expenses shall be shared equally between the Owners and the 111
Charterers. 112
Both surveys shall cover the condition of the Vessel and her equipment as well as 113
quantities of fuels remaining on board. The Owners shall instruct the Master to co- 114
operate with the surveyors in conducting such surveys. 115

**6. Bunkers   see clause 27** 116
(a) *Quantity at Delivery/Redelivery* - The Vessel shall be delivered with about the quantity 117
of fuels stated in Box 19 and, unless indicated to the contrary in Box 20, the Vessel 118
Shall be redelivered with about the same quantity, provided that the quantity of 119
Fuels at redelivery is at least sufficient to allow the Vessel to safely reach the nearest 120
port at which fuels of the required type or better are available. 121
(b) *Bunkering prior to Delivery and Redelivery* - Provided that it can be accomplished 122
at scheduled ports, without hindrance to the operation of the Vessel, and by prior 123
arrangement between the parties, the Owners shall allow the Charterers to bunker 124
for the account of the Charterers prior to delivery and the Charterers shall allow the 125
Owners to bunker for the account of the Owners prior to redelivery. 126
(c) *Purchase Price* - The Charterers shall purchase the fuels on board at delivery at 127
the price stated in Box 21 and the Owners shall purchase the fuels on board at 128
redelivery at the price stated in Box 22. The value of the fuel on delivery shall be 129
paid together with the first instalment of hire. 130
(d) *Bunkering* - The Charterers shall supply fuel of the specifications and grades stated 131
in Box 23. The fuels shall be of a stable and homogeneous nature and unless 132
otherwise agreed in writing, shall comply with ISO standard 8217: 1996 or any 133
subsequent amendments thereof as well as with the relevant provisions of Marpol. 134
The Chief Engineer shall co-operate with the Charterers' bunkering agents and 135
fuel suppliers and comply with their requirements during bunkering, including but 136
not limited to checking, verifying and acknowledging sampling, readings or 137
soundings, meters etc. before, during and/or after delivery of fuels. During delivery 138
four representative samples of all fuels shall be taken at a point as close as possible 139
to the Vessel's bunker manifold. The samples shall be labelled and sealed and 140
signed by suppliers, Chief Engineer and the Charterers or their agents. Two samples 141
Shall be retained by the suppliers and one each by the Vessel and the Charterers. 142
If any claim should arise in respect of the quality or specification or grades of the 143
Fuels supplied, the samples of the fuels retained as aforesaid shall be analysed by 144
a qualified and independent laboratory. 145
(e) *Liability* - The Charterers shall be liable for any loss or damage to the Owners 146
caused by the supply of unsuitable fuels or fuels which do not comply with the 147
specifications and grades set out in Box 23 and the Owners shall not be held liable 148
for any reduction in the Vessel's speed performance and/or increased bunker 149
Consumption nor for any time lost and any other consequences arising as a result 150
of such supply. 151

**7. Vessel's Gear, cranes,  ramps, doors,hatchcovers** and Equipment 152
(a) *Regulations* - The Vessel's cargo gear, if any, and any other related equipment 153
shall comply with the law and national regulations of the countries to which the 154
Vessel may be employed and the Owners shall ensure that the Vessel is at all times 155

This document is a computer generated GENTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "GENTIME" General Time Charter Party

In possession of valid certificates to establish compliance with such regulations. If 156
stevedores are not permitted to work due to failure of the Master and/or the Owners 157
To comply with the aforementioned regulations or because the Vessel is not in 158
possession of such valid certificates, then the Charterers may suspend hire for the 159
time lost thereby and the Owners shall pay all expenses incurred incidental to and 160
resulting from such failure (see Clause 11(d)). 161

(b) Breakdown of Charterers' Gear, cranes, ramps, doors,hatchcovers – All cargo handling 162
gear/ramps, including but not limited to derricks/cranes/ 163
Winches/ramps/doors/hatchcovers shall be kept in good working order and the 163
Owners shall exercise
due diligence in maintaining such gear. In the event of loss of time due to a 164
breakdown/slow down/stoppage
of derrick(s), crane(s) or winch(es), ramps, doors, hatchcovers for any period by 165
reason of disablement or
insufficient power or hydraulic failure, the hire shall be reduced for the actual time lost 166
thereby during
loading/discharging unless the lost time is caused by negligence of the Charterers 167
or their servants. If the Charterers continue working by using shore-crane(s) the 168
Owners shall pay the cost of shore craneage, to an amount not exceeding the 169
amount of hire payable to the Owners for such period. Owners to confirm that the 170
cranes are now under repairs/overhauling and that at time of delivery, the cranes will be
in full and complete working condition for the lifting of containers at max load 30 MT
without any stoppage for cooling between cycles.

(c) Suez and Panama Canal - During the currency of this Charter Party the Vessel 171
shall be equipped with all necessary fittings in good working order for Suez and 172
Panama Canal transit . 173

(d) Lighting - The Owners shall ensure that the Vessel will supply, free of expense to 174
the Charterers, sufficient lighting on all the decks and in holds to permit 24 hours/7 175
days working.

### 8. Hire 176

(a) Rate - The Charterers shall pay hire per day or pro rata for any part of a day from 177
the time the Vessel is delivered to the Charterers until her redelivery to the Owners, 178
in the currency and at the rate stated in Box 24. In the event that additional hire is 179
Payable in accordance with Clause 9(d) such hire shall be based on the rate 180
applicable at the time of redelivery. All calculation of hire shall be made by reference 181
to UTC (Universal Time Coordinated).

(b) Payment - Subject to sub-clause (d) payment of hire shall be made in advance in 182
full, without discount less commission due to the brokers every 15 30 days to the 183
Owners' bank account designated in Box 184
25 or to such other account as the Owners may from time to time designate in 185
Writing, in funds available to the Owners on the due date. 186

(c) Default - In default of punctual and regular payment of hire the Owners shall have 187
the right to withdraw the Vessel, to retain any hire already paid, to claim for payment 188
of any outstanding hire and to claim for payment of the balance of hire not paid yet for
the entire remaining period of charter under Box 6 without prejudice to any other claim the
Owners
may have against the Charterers under this Charter Party. 189
Where there is a failure to make punctual and regular payment of hire due to 190
oversight, negligence, errors or omissions on the part of the Charterers or their 191
Bankers, the Owners shall give the Charterers written notice of the number of clear 192
banking days stated in Box 26 (as recognized at the agreed place of payment and at 193
the Place of Business of the Charterers) in
which to rectify the failure, and where so rectified within such number of days following 194
the Owners' notice, the payment shall stand as regular and punctual. Failure by the 195
Charterers to pay hire within the number of days stated in Box 26 of their receiving 196
the Owners' notice as provided herein, shall entitle the Owners to withdraw the 197
Vessel without further notice and without prejudice to any other claim they may 198
have against the Charterers. 199
Further, at any time after the period stated in Box 26, as long as hire remains 200
unpaid, the Owners shall, without prejudice to their right to withdraw, be entitled to 201
suspend the performance of any and all of their obligations hereunder and shall have 202
no responsibility whatsoever for any consequences thereof in respect of which the 203
Charterers hereby agree to indemnify the Owners. Notwithstanding the provisions of 204
Clause 9(a)(ii), hire shall continue to accrue and any extra expenses resulting from 205
such suspension shall be for the Charterers' account. 206

(d) Deductions - On production of supporting vouchers the Charterers shall be entitled 207
to deduct from the next hire due any expenditure incurred on behalf of the Owners 208
which is for the Owners' account under this Charter Party. If such expenditure is 209
Incurred in a currency other than that in which hire is payable, conversion into such 210
currency for the purpose of deduction shall be effected at the rate of exchange 211
prevailing on the date the expenditure was incurred. 212

(e) Redelivery Adjustment - Should the Vessel be on her voyage towards the port or 213
place of redelivery at the time payment of hire becomes due, said payment shall be 214
made for the estimated time necessary to complete the voyage, less the estimated 215
value of the fuels remaining on board at redelivery. When the Vessel is redelivered to 216
the Owners any difference shall be refunded to or paid by the Charterers as appropriate, 217
but not later than thirty days after redelivery of the Vessel. 218

(f) Ballast Bonus : N/A

### 9. Off-hire 219

After delivery in accordance with Clause 1 hereof the Vessel shall remain on hire until 220
redelivered in accordance with Clause 4, except for the following periods: 221

(a) Inability to Perform Services 222
If the Vessel is unable to comply with the instructions of the Charterers on account of: 223

(i) any damage, defect, breakdown, deficiency of, or accident to the Vessel's hull, 224
machinery, equipment, cranes, ramps, doors, hatchcovers or repairs or 225
maintenance thereto, including drydocking,
excepting those occasions where Clauses 7(b) and 16(b) apply; 226

(ii) any deficiency of the Master, Officers and/or Crew, including the failure or refusal 227
or inability of the Master, Officers and/or Crew to perform services when required; 228

(iii) Arrest of the Vessel at the suit of a claimant except where the arrest is caused 229
by, or arises from any act or omission of the Charterers, their servants, agents 230
or sub-contractors; 231

(iv) the terms of employment of the Master, Officers and/or Crew; 232

(v) Certificates : See clause 33
(vi) any reduction in vessel's speed as mentionned in Box 5.
(vii) any crane slowdown/stoppage due to overheating
then the Vessel will be off-hire for the time thereby lost and the extra bunkers 233
consumed during any offhire period shall be for the Owners' account.

(b) Deviation - In the event of the Vessel deviating (which expression includes putting 234
Back, or putting into any port or place other than that to which she is bound under the 235
Instructions of the Charterers) for reasons other than to save life or property the 236
Vessel shall be off-hire from the commencement of such deviation until the time when 237
The Vessel is again ready to resume her service from a position not less favourable to 238
The Charterers than that at which the deviation commenced, provided always that 239
due allowance shall be given for any distance made good towards the Vessel's 240
destination and any bunkers saved. However, should the Vessel alter course to avoid 241
bad weather or be driven into port or anchorage by stress of weather, the Vessel shall 242
remain on hire and all costs thereby incurred shall be for the Charterers' account. 243

(c) Requisitions - Should the Vessel be requisitioned by any government or governmental 244
Authority during the period of this Charter Party, the Owners shall immediately notify 245
The Charterers. The Vessel shall be off-hire during the period of such requisition and 246
any hire or compensation paid by any government or governmental authority in respect 247
of such requisition shall be paid to the Owners. However, if the period of requisition 248
Exceeds the number of days stated in Box 27, either party shall have the option of 249
cancelling the balance period of the Charter Party, by giving 14 days notice of 250
Cancellation to the other. 251

(d) Addition to Charter Period - Any time during which the Vessel is off-hire under this 252
Charter Party may be added, at the option of the Charterers, to the charter period as 253
Determined in accordance with Clause 1(a). Such option shall be declared in writing 254
not less than one month before the expected date of redelivery. within maximum one 255
month after the event occurs or latest one week
After the event if such event occurs less than one month before the expected date of 256
redelivery. 257

(e) Early Termination of the Charter Period – The Charterers have the right to
terminate at any time the Charter Party if the accrued offhire period for inability to
perform Services (see para a hereabove) equals or exceeds 720 hours since the delivery
without prejudice to any other claim the Charterers may have against the Owners under
this Charter Party.

### 10. Loss of Vessel 258
This Charter Party shall terminate and hire shall cease at noon on the day the Vessel is 259
lost or becomes a constructive total loss and if missing, at noon on the date when last 260
Heard of. Any hire paid in advance and not earned shall be returned to the Charterers and 261
payment of any hire due shall be deferred until the Vessel is reported safe. 262

### 11.Owners' Obligations 263
Except as provided elsewhere in this Charter Party, the Owners shall deliver the Vessel in 264
the Class indicated in Box 5 and in a thoroughly efficient state of hull and machinery and 265
shall exercise due diligence to maintain the Vessel in such Class and in every way fit for 266
the service throughout the period of the Charter Party. 267
Nothing contained in this Charter Party shall be construed as a demise of the Vessel to 268
the Charterers and the Owners remain at all times responsible for her navigation and for 269
the due performance of related services and all other matters, including but not limited to 270
pilotage and towage
even if paid for by the Charterers. 271
Unless otherwise agreed, the Owners shall provide and pay for the costs of the following:- 272
(a) Wages — Master's , Officers' and Crew's wages. including overtime 273
(b) Stores –All provisions, deck and engine-room stores, including lubricants/fresh water. 274
(c) Insurance of the Vessel. (See Clause 20). 275
(d) Crew's assistance in:- 276
(i) preparing the Vessel's cranes, derricks, winches and/or cargo handling gear 277
For use, 278
(ii) opening and closing any hatches (other than pontoon type hatches), ramps 279
And other means of access to cargo, 280
(iii) docking, undocking and shifting operations in port, 281
(iv) bunkering, 282
(v) maintaining power during loading and discharging-operations, 283
(vi) instructing crane drivers and winchmen in the use of the Vessel's gear, 284
(vii) lashing and/or unlashing the vehicles/containers/mafis
(vii) cleaning and ventilating the hold as necessary
(viii) plugging/unplugging/monitoring/cording the performance of reefer
integrated containers/vehicles.
The above services will be rendered by the crew if required, provided port and local 285
Regulations permit; otherwise charges for such services shall be for the Charterers' 286
account. 287
(e) Documentation - Any documentation relating to the Vessel as required at the 288
commencement of the Charter Party to permit the Vessel to trade within the limits 289
provided in Box 13, including but not limited to ISPS certificates, ISM certificates, 290

This document is a computer generated GENTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# PART II
## "GENTIME" General Time Charter Party

international tonnage certificate, Suez

| | |
|---|---|
| and Panama tonnage certificates, certificate of registry, certificates relating to the | 291 |
| strength, safety and/or serviceability of the Vessel's gear and certificates of financial | 292 |
| responsibility for oil pollution as long as such oil pollution certificates can be obtained | 293 |
| by the Owners in the market on ordinary commercial terms. | 294 |
| Such documentation shall be maintained during the currency of the Charter Party as | 295 |
| Necessary. | 296 |
| (f) *Deratisation* - A deratisation certificate at the commencement of the Charter Party | 297 |
| and any renewal thereof throughout the Charter Party, except if certification is required | 298 |
| as a result of the cargo carried or ports visited under this Charter Party in which case | 299 |
| all expenses in connection therewith shall be for the account of the Charterers. | 300 |
| (g) *Smuggling* - Any fines, taxes or imposts levied in the event of smuggling by the Master, | 301 |
| Officers and/or Crew. The Vessel shall be off-hire for any time lost as a result | 302 |
| thereof. See also Clause 13(f). | 303 |
| **(h) Removal/disposal of sludge/oily waters/garbage shall be paid and arranged by** | |
| **the Owners' account and under the Master/Owners responsibility** | |

**12. Master** — 304

| | |
|---|---|
| The Master shall be conversant with the English language and, although appointed | 305 |
| by the Owners, shall at all times during the currency of this Charter Party be under | 306 |
| the orders and directions of the Charterers as regards **commercial** employment, agency | 307 |
| **or other** | |
| **arrangements.** The Master shall prosecute all voyages with due dispatch and supervise | 308 |
| Loading-and discharging operations to ensure that the seaworthiness of the Vessel is | 309 |
| Not affected. | 310 |
| The Charterers recognise the principles stated in IMO Resolution A.443 (XI) as regards | 311 |
| Maritime safety and protection of the marine environment and shall not prevent the | 312 |
| Master from taking any decision in this respect which in his professional judgement is | 313 |
| necessary. | 314 |
| **The Master shall be skilled in frequent berthing and unberthing without the** | |
| **assistance of tugs where/when permitted by local authorities.** | |
| **Where pilotage/towage are not compulsory, the use of pilots/tugs shall be limited to** | |
| **the minimum but always according to the Master sole decision who remains** | |
| **responsible for navigation.** | |

**13. Charterers' Obligations** — 315

| | |
|---|---|
| The Charterers shall keep and care for the cargo at loading and discharging **at ports of** | 316 |
| **call, be** | |
| responsible for the stevedoring operations enumerated under sub-clause 13(d), | 317 |
| arrange any transhipment and properly deliver the cargo at destination. | 318 |
| The Charterers shall furnish the Master with full and timely instructions and unless | 319 |
| otherwise agreed, they shall provide and pay for the costs of the following throughout | 320 |
| The currency of this Charter Party: | 321 |
| (a) *Voyage Expenses* - All port charges (including compulsory charges for shore | 322 |
| watchmen and garbage removal), light and canal dues, pilotage, towage, consular | 323 |
| charges, and all other charges and expenses relating to the cargo and/or the | 324 |
| Vessel as a result of her employment hereunder, other than charges or expenses | 325 |
| provided for in Clause 11. | 326 |
| (b) *Bunker Fuel* (See Clause 6) - All fuels except for quantities consumed while the | 327 |
| Vessel is off-hire. | 328 |
| (c) *Agency Costs* - All agency fees for normal ship's husbandry at all ports or places | 329 |
| of call. In the event of any specific or unusual agency matters included but not | 330 |
| **limited to extensive repairs, drydocking, crew change, the Owners will either appoint** | |
| **their own agent or will enter into a separate direct agreement with the agent appointed** | |
| **by the Charterers or with the Charterers' local office.** | |
| (d) *Stevedoring* - All stevedoring operations during the currency of this Charter Party | 331 |
| including receipt, loading, handling, stuffing containers, stowing, lashing, securing, | 332 |
| unsecuring, unlashing, discharging, stripping containers, tallying and delivering | 333 |
| of all cargo **vehicles .** | 334 |
| (e) *Advances to Master* - Reasonable funds which, upon request by the Owners, are | 335 |
| to be made available by Charterers' local agents to the Master for disbursements. | 336 |
| The Charterers may deduct such advance funds from hire payments **plus a 5%** | 337 |
| **fee. .The Charterers shall be in no way responsible for the application of such advance.** | |
| (f) *Contraband* - Any fines, taxes or imposts levied in the event that contraband and/ | 338 |
| or unmanifested drugs and/or cargoes are found to have been shipped as part of | 339 |
| the cargo and/or in containers on board. The Vessel shall remain on hire during | 340 |
| any time lost as a result thereof. However, if it is established that the Master, | 341 |
| Officers and/or Crew are involved in smuggling then any security required shall | 342 |
| be provided by the Owners. See also Clause 11(g). | 343 |

**14. Owners' Requirements** — 344

| | |
|---|---|
| (a) *Maintenance* - Without prejudice to the provisions of Clause 9(a)(i), the Owners | 345 |
| shall have the right to take the Vessel out of service at any time for emergency | 346 |
| Repairs, and by prior arrangement with the Charterers for routine maintenance, | 347 |
| **including drydocking. .The vessel is not scheduled for drydock or not scheduled for** 348 |
| **yards maintenance during the currency of charter including optional periods before** | |
| **27th April 2021.** | |
| (b) *General Average* - General Average shall be adjusted, stated and settled at the | 349 |
| place shown in Box 28 according to the York-Antwerp Rules 1994 or any | 350 |
| subsequent modification thereto by an adjuster appointed by the Owners. Charter | 351 |
| hire shall not contribute to General Average. | 352 |
| General Average shall be adjusted in any currency at the sole option of the Owners. | 353 |
| Exchange into the currency of adjustment shall be calculated at the rate prevailing | 354 |
| on the date of payment for disbursements and on the date of completion of | 355 |
| discharge of the Vessel for allowances, contributory values etc. | 356 |

| | |
|---|---|
| The Charterers agree to co-operate with the Owners and their appointed adjuster | 357 |
| by supplying manifest and other information and, where required, to endeavour | 358 |
| to secure the assistance of the Charterers' local agents in the collection of security, | 359 |
| at the Owners' expense. | 360 |
| (c) *Salvage* - All salvage and assistance to other vessels shall be for the Owners' | 361 |
| And the Charterers' equal benefit after deducting the Master's and Crew's | 362 |
| proportion and all legal and other expenses including hire paid under the Charter | 363 |
| Party for time lost in the salvage, damage to the Vessel and fuel consumed. The | 364 |
| Charterers shall be bound by all measures taken by the Owners in order to secure | 365 |
| payment of salvage and to settle its amount. | 366 |
| (d) *Lien* — The Charterers warrant that they will not suffer, nor permit to be continued, | 367 |
| any lien or encumbrance incurred by them or their agents, which might have | 368 |
| priority over the title and interest of the Owners in the Vessel. In no event shall | 369 |
| the Charterers procure, nor permit to be procured, for the Vessel, any supplies, | 370 |
| necessaries or services without previously obtaining a statement signed by an | 371 |
| ~~Authorised~~**authorized** representative of the furnisher thereof, acknowledging that such | 372 |
| supplies, necessaries or services are being furnished on the credit of the | 373 |
| Charterers and not on the credit of the Vessel or of the Owners and that the | 374 |
| furnisher claims no maritime lien on the Vessel thereof. | 375 |
| The Owners shall have a lien on all shipped cargo before or after discharge and | 376 |
| on all sub-freights and/or sub-hire including deadfreight and demurrage, for any | 377 |
| amount due under this Charter Party including but not limited to unpaid charter | 378 |
| Hire, unreimbursed Charterers' expenses initially paid by the Owners, and | 379 |
| contributions in general average properly due. | 380 |
| The Charterers shall ensure that such lien is incorporated in all documents | 381 |
| containing or evidencing Contracts of Carriage issued by them or on their behalf. | 382 |

**15. Charterers' Requirements** — 383

| | |
|---|---|
| (a) *Plans* - On concluding this Charter Party or as soon as practical thereafter the | 384 |
| Owners shall provide the Charterers with copies of any operational plans or | 385 |
| documents that the Charterers may reasonably request and which are necessary | 386 |
| for the safe and efficient operation of the Vessel. All documents received by the | 387 |
| Charterers shall be returned to the Owners on redelivery. | 388 |
| (b) *Flag and Funnel* - If they so require, the Charterers shall, during the currency of | 389 |
| This Charter Party, be allowed to fly their house flag and/or paint the funnel in the | 390 |
| Charterers' colours. All alterations including re-instatement shall be effected in | 391 |
| the Charterers' time and at their expense. | 392 |
| (c) *Communications Facilities* - The Owners shall permit the Charterers' use of the | 393 |
| Vessel's communication facilities at cost. | 394 |
| (d) *Logs* - The Owners shall maintain full deck and engine room logs during the | 395 |
| currency of this Charter Party and the Charterers shall have full access to all the | 396 |
| Vessel's logs, rough and official, covering this period. The Owners undertake to | 397 |
| produce all such documentation promptly upon written request of the Charterers | 398 |
| And to allow them to make copies of relevant entries. | 399 |
| (e) *Replacement of Master and Officers* - If the Charterers shall have reason to be | 400 |
| dissatisfied with the conduct of the Master or Officers, the Owners shall, on | 401 |
| receiving particulars of the complaint in writing, investigate same and, if necessary, | 402 |
| replace the offending party or parties at their expense. | 403 |
| ~~(f) Supercargo - The Owners shall provide and maintain a clean and adequate room~~ | 404 |
| ~~for the Charterers' Supercargo if any, furnished to the same standard as officers'~~ | 405 |
| ~~Accommodation. The Supercargo shall be victualled with the Vessel's officers. The~~ | 406 |
| ~~Charterers shall pay at the daily rate shown in Box 29 for his accommodation and~~ | 407 |
| ~~victualling. The Supercargo shall be on board at the risk and expense of the~~ | 408 |
| ~~Charterers and both Charterers and Supercargo shall sign the customary indemnity~~ | 409 |
| ~~Forms.~~ | 410 |
| ~~(g) Victualling — The Owners shall, when requested and authorised in writing by the~~ | 411 |
| ~~Charterers or their agents, victual other officials and servants of the Charterers at~~ | 412 |
| ~~the rate per person per meal shown in Box 30.~~ | 413 |
| ~~(h) Representation — Expenses for representation incurred by the Master for the~~ | 414 |
| ~~Charterers' account and benefit shall be settled by the Charterers' payment of the~~ | 415 |
| ~~amount stated in Box 35, per month or pro rata. The Charterers shall indemnify the~~ | 416 |
| ~~Owners against all consequences and/or liabilities including customs fines which~~ | 417 |
| ~~May result from such representation.~~ | 418 |
| (i) *Sub-Letting* - The Charterers shall have the right to sub-let all or part of the Vessel | 419 |
| Whilst remaining responsible to the Owners for the performance of this Charter | 420 |
| Party. | 421 |
| (j) *Inspections* - The Charterers shall, upon giving reasonable notice, have the right to | 422 |
| a superficial inspection of the Vessel in their time and the Master shall within reason | 423 |
| co-operate with the Charterers to facilitate their inspection of the Vessel. The | 424 |
| Charterers shall pay for any and all expenses associated with such inspection and | 425 |
| the Owners shall be entitled to receive a copy of the report. | 426 |
| (k) *Weather Routeing* - The Charterers may supply the Master with weather routeing | 427 |
| information during the currency of this Charter Party. In this event the Master, though | 428 |
| not obliged to follow routeing information, shall comply with the reporting procedure | 429 |
| of the Charterers' weather routeing service. | 430 |
| (l) *Laying up* - At the written request of the Charterers, the Owners shall at any time | 431 |
| provide an estimate of any economies which may be possible in the event of laying- | 432 |
| up the Vessel. The Charterers shall then have the right to order the laying-up of the | 433 |
| Vessel at any time and for any period of time at a safe berth or safe place in their | 434 |
| Option, and in the event of such laying-up the Owners shall promptly take reasonable | 435 |
| Steps to effect all the economies in operating costs. The laying-up port or place and | 436 |
| laid-up arrangements shall be subject to approval by the Owners' insurers. Laying- | 437 |

This document is a computer generated GENTIME form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# PART II
# "GENTIME" General Time Charter Party

up preparation and reactivation cost, and all expenses incurred shall be for the 438
Charterers' account. The Charterers shall give sufficient notice of their intention in 439
this respect to enable the Owners to make necessary arrangements for 440
decommissioning and recommissioning. The Owners must give prompt credit to 441
the Charterers for all economies achieved. 442

(m)*Cleaning* - The Charterers may request the Owners to direct the crew to sweep 443
and/or wash and/or clean-the holds /weather decks/ramp between voyages and/or 444
between cargoes

against payment at the rate per hold stated in Box 32, provided the crew is able to 445
undertake such work and is allowed to do so by local regulations. In connection 446
with any such operation the Owners shall not be responsible if the Vessel's holds 447
/weather decks/ramp

are not accepted or passed. **The rate as stated in Box 32 is only to apply if/when a** 448
**full cleaning of full vessel's commercial areas holds/decks/ramps is requested by the**
**Charterers.**

In lieu of cleaning the Charterers shall have the option to re-deliver the Vessel with 449
unclean/unswept holds against the lump sum payment stated in Box 33 excluding 450
the disposal of dunnage and/or waste, which shall be for Charterers' account. 451

## 16. Sundry Matters 452

(a) *Stowaways* 453

(i)  The Charterers shall exercise due care and diligence in preventing stowaways 454
     from gaining access to the Vessel by means of secreting away in cargo or 455
     containers shipped by the Charterers. 456

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways 457
     have gained access to the Vessel by means of secreting away in the cargo 458
     and/or containers shipped by the Charterers, this shall amount to breach of 459
     charter for the consequences of which the Charterers shall be liable and shall 460
     hold the Owners harmless and shall keep them indemnified against all claims 461
     whatsoever which may arise and be made against them. Furthermore, all time 462
     lost and all expenses whatsoever and howsoever incurred, including fines, 463
     shall be for the Charterers' account and the Vessel shall remain on hire. 464

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter 465
      according to sub-clause (ii) above, the Charterers shall take all reasonable 466
      steps to secure that within a reasonable time, the Vessel is released and at 467
      their expense post bail or other security to obtain release of the Vessel. 468

(iv) If, despite the exercise of due care and diligence by the Owners, stowaways 469
     have gained access to the Vessel by means other than secreting away in the 470
     cargo and/or containers shipped by the Charterers, all time lost and all expenses 471
     whatsoever and howsoever incurred, including fines, shall be for the Owners' 472
     account. 473

(v) Should the Vessel be arrested as a result of stowaways having gained access 474
    to the Vessel by means other than secreting away in the cargo and/or containers 475
    shipped by the Charterers, the Owners shall take all reasonable steps to secure 476
    that within a reasonable time, the Vessel is released and at their expense post 477
    bail or other security to obtain release of the Vessel. 478

(b) *Stevedore Damage* - Notwithstanding anything contained herein to the contrary, 479
the Charterers shall be liable for any and all damage to the Vessel caused by 480
stevedores, provided the Master has notified the Charterers or their agents, in writing, 481
within 24 hours of the occurrence or as soon as possible thereafter but latest when 482
the damage could have been discovered by the exercise of due diligence. 483
The Master shall use his best efforts to obtain written acknowledgment by the party 484
or parties causing damage unless the damage has been made good in the 485
meantime. 486

(i) Stevedore damage affecting the Vessel's seaworthiness and/or the safety of 487
    the crew, proper working of the Vessel and/or her equipment, shall be repaired 488
    immediately by the Charterers and the Vessel is to remain on hire until such 489
    repairs are completed and, if required, passed by the Vessel's classification 490
    society. 491

(ii) Stevedore damage not affecting the Vessel's seaworthiness and/or the safety 492
     of the crew shall be repaired, at the Charterers' option, before or after redelivery 493
     concurrently with Owners' work. In the latter case no hire will be paid to the 494
     Owners except in so far as the time required for the repairs for which the Charterers 495
     Are liable exceeds the time necessary to carry out the Owners' work. 496

(iii) The Owners shall have the option of requiring that stevedore damage affecting 497
      the trading capabilities of the Vessel is repaired before redelivery. 498

(c) *Fumigation* - Expenses in connection with fumigations and/or quarantine ordered 499
because of cargo carried or ports visited while the Vessel is employed under this 500
Charter Party shall be for the Charterers' account. Expenses in connection with all 501
other fumigations and/or quarantine shall be for the Owners' account. 502

(d) *Anti-drug Clause* - The Charterers warrant to exercise the highest degree of care 503
and diligence in preventing unmanifested narcotic drugs and/or any other illegal 504
substances being loaded or concealed on board the Vessel. 505
Non-compliance with the provisions of this Clause shall amount to breach of warranty 506
for the consequences of which the Charterers shall be liable and shall hold the 507
Owners, the Master and the crew of the Vessel harmless and shall keep them 508
indemnified against all claims whatsoever which may arise and be made against them 509
individually or jointly. Furthermore, all time lost and all expenses incurred, 510
including fines, as a result of the Charterers' breach of the provisions of this Clause 511
shall be for the Charterers' account and the Vessel shall remain on hire. 512
Should the Vessel be arrested as a result of the Charterers' non-compliance with 513
the provisions of this Clause, the Charterers shall at their expense take all reasonable 514
steps to secure that within a reasonable time the Vessel is released and at their 515

expense post bail to secure release of the Vessel. 516
The Owners shall remain responsible for all time lost and all expenses incurred, 517
including fines, in the event that unmanifested narcotic drugs and other illegal 518
substances are found in the possession or effects of the Vessel's personnel. 519

## 17. Bills of Lading, Waybills and Other Contracts of Carriage 520

(a) *Signing Contracts of Carriage* 521

(i)  The Master shall sign bills of lading or waybills as presented in conformity with 522
     mate's receipts. If requested, the Owners may authorise the Charterers and/or 523
     their agents in writing to sign bills of lading, waybills, through bills of lading, or 524
     Multimodal bills of lading (hereafter collectively referred to as Contracts of 525
     Carriage) on the Owners' and/or Master's behalf in conformity with mate's 526
     receipts without prejudice to the terms and conditions of the Charter Party. 527

(ii) In the event the Charterers and/or their agents, pursuant to the provisions of 528
     sub-clause 17(a)(i) above, sign Contracts of Carriage which extend the Owners' 529
     responsibility beyond the period during which the cargo is on board the Vessel 530
     the Charterers shall indemnify the Owners against any claims for loss, damage 531
     or expense which may result therefrom. 532

(iii) Neither the Charterers nor their agents shall permit the issue of any Contract 533
      of Carriage (whether or not signed on behalf of the Owners or on behalf of the 534
      Charterers or on behalf of any Sub-Charterers) incorporating, where not 535
      compulsorily applicable, the Hamburg Rules or any other legislation giving 536
      effect to the Hamburg Rules or any other legislation imposing liabilities in excess 537
      of Hague or Hague-Visby Rules. 538

(b) *Protective Clauses* - The Charterers warrant that Contracts of Carriage issued in 539
respect of cargo under this Charter Party shall incorporate the clauses set out in 540
Appendix A. 541

(c) *Deck Cargo* - Unless the cargo is stowed in fully closed containers/**vehicles**, placed on 542
board the Vessel in areas designed for the carriage of containers/**vehicles**  with class- 543
approved

container fittings, and secured to the Vessel by means of class-approved Vessel's 544
lashing gear or material, Contracts of Carriage covering cargo carried on deck 545
shall be claused: "Agreed to be shipped on deck at Charterers', Shippers' and 546
Receivers' risk, and responsibility for loss, damage or expense howsoever caused". 547

(d) *Defence of Claims* - Should the Charterers issue or cause to be issued a Contract 548
of Carriage in default of the provisions of this Clause 17, they shall be obliged upon 549
written request by the Owners to take over, pay for the defence of and pay any 550
liability established in respect of any claim brought against the Vessel and/or the 551
Owners as a result of such default. 552

(e) *Payment and Indemnity* - The Charterers shall pay for, and/or indemnify the Owners 553
against any loss, damage or expense which results from any breach of the provisions 554
of this Clause 17. 555

## 18. Responsibilities 556

(a) *Cargo Claims* 557

(i)  *Definition* - For the purpose of this Clause 18(a), Cargo Claim means a 558
     claim for loss, damage, shortage, (including slackage, ullage or pilferage), 559
     overcarriage of or delay to cargo including customs fines or fines in respect 560
     of such loss, damage, shortage, overcarriage or delay and includes: 561
     (1) any legal costs or interest claimed by the original claimant making such a 562
         claim; 563
     (2) all legal, Club correspondents' and experts' costs reasonably incurred in 564
         the defence of or in the settlement of the claim made by the original claim- 565
         ant, but shall not include any costs of whatsoever nature incurred in making 566
         a claim or in seeking an indemnity under this Charter Party. 567

(ii) *Claim Settlement* - It is a condition precedent to the right of recovery by either 568
     party under this Clause 18(a) that the party seeking indemnity shall have first 569
     properly settled or compromised and paid the claim. 570

(iii) *Owners' Liability* - The Owners shall be liable for any Cargo Claim arising or 571
      resulting from: 572
      (1) failure of the Owners or their servants to exercise due diligence before or 573
          at the beginning of each voyage to make the Vessel seaworthy; 574
      (2) failure of the Owners or their servants properly and carefully to carry, 575
          keep and care for the cargo while on board; 576
      (3) unreasonable deviation from the voyage described in the Contract of 577
          Carriage unless such deviation is ordered or approved by the Charterers; 578
      (4) errors in navigation or the management of the Vessel solely where the 579
          Contract of Carriage is subject to mandatory application of legislation 580
          giving effect to the Hamburg Rules. 581
      **(5) failure to provide electrical power to integral refrigerated containers or any**
      **other container with any machinery for temperature/atmosphere control containing**
      **goods or failure to monitor and record the performance of all such units minimum once**
      **daily.**

(iv) *Charterers' Liability* - The Charterers shall be liable for any Cargo Claim arising 582
     or resulting from: 583
     (1) the stevedoring operations enumerated under Clause 13(d) unless the 584
         Charterers prove that such Cargo Claim was caused by the unseaworthi- 585
         ness of the Vessel, in which case the Owners shall be liable; 586
     (2) any transhipment in connection with through-transport or multimodal 587
         transport, save where the Charterers can prove that the circumstances 588
         giving rise to the Cargo Claim occurred after commencement of the 589
         loading of the cargo onto the Vessel and prior to its discharge; 590
     (3) the carriage of cargo on deck unless such cargo is stowed in fully closed 591

# PART II
# "GENTIME" General Time Charter Party

carriage   Containers/**Vehicles**, placed on board the Vessel in areas designed for the   592
of containers/**Vehicles** with class-approved container fittings and secured to the   593
Vessel by means of class-approved Vessel's lashing gear or material.

(v) *Shared Liability* - All Cargo Claims arising from other causes than those   594
enumerated under sub-clauses (iii) and (iv), shall be shared equally between   595
the Owners and the Charterers unless there is clear and irrefutable evidence   596
that the claim arose out of pilferage or the act or neglect of one or the other   597
party or their servants or sub-contractors, in which case that party shall bear   598
the full claim.   599

(vi) *Charterers' Own Cargo* - If the cargo is the property of the Charterers, the   600
Owners shall have the same responsibilities and benefits as they would have   601
had under this Clause had the cargo been the property of a third party and   602
carried under a Bill of Lading incorporating the Hague-Visby Rules.   603

(b) *Fines, etc.* - The Charterers shall also be liable to the Owners for any losses,   604
damages, expenses, fines, penalties, or claims which the Owners may incur or   605
suffer by reason of the cargo or the documentation relating thereto failing to comply   606
with any relevant laws, regulations, directions or notices of port authorities or other   607
authorities, or by reason of any infestation, contamination or condemnation of the   608
cargo or of infestation, damage or contamination of the Vessel by the cargo.   609

(c) *Deck cargo* - The Charterers shall be liable to the Owners for any loss, damage,   610
expense or delay to the Vessel howsoever caused and resulting from the carriage   611
of cargo on deck save where the Charterers can prove that such loss, damage,   612
expense or delay was the result of negligence on the part of the Owners and/or   613
their servants. **or save the deck cargo is stowed in fully closed containers/vehicles**   614
**placed on board the Vessel in areas designated for the carriage of containers/vehicles**
**with class approved container fittings and secured to the Vessel by means of Class**
**approved Vessel's lashing gear or material.**

(d) *Death or Personal Injury* - Claims for death or personal injury having a direct   615
connection with the operation of the Vessel shall be borne by the Owners unless   616
such claims are caused by defect of the cargo or by the act, neglect or default of the   617
Charterers, their servants, agents or sub-contractors.   618

(e) *Agency* - The Owners authorise and empower the Charterers to act as the Owners'   619
Agents solely to ensure that, as against third parties, the Owners will have the   620
benefit of any immunities, exemptions or liberties regarding the cargo or its carriage.   621
Subject to the provisions of Clause 17 the Charterers shall have no authority to   622
make any contracts imposing any obligations whatsoever upon the Owners in respect   623
of the cargo or its carriage.   624

(f) *Indemnity and Limitation* - The Owners and the Charterers hereby agree to indemnify   625
each other against all loss, damage or expenses arising or resulting from any   626
obligation to pay claims, fines or penalties for which the other party is liable in   627
accordance with this Charter Party. Both the Owners and the Charterers shall retain   628
their right to limit their liability against the other party in respect of any claim brought   629
by way of indemnity, notwithstanding that the other party has been denied the right   630
to limit against any third party or has failed in whatever manner to exercise its rights   631
of limitation.   632

(g) *Time Bar* - In respect of any Cargo Claims as between the Owners and the   633
Charterers, brought under sub-clause 18(a), unless extensions of time have been   634
sought or obtained from one party by the other or notice of arbitration has been   635
given by either party, such claim(s) shall be deemed to be waived and absolutely   636
time barred upon the expiry of two years reckoned from the date when the cargo   637
was or should have been delivered. When the Hamburg Rules apply compulsorily   638
the above time bar shall be extended to three years.   639

## 19. Exceptions   640

As between the Charterers and the Owners, responsibility for any loss, damage, delay   641
or failure of performance under this Charter Party not dealt with in Clause 18(a), shall   642
be subject to the following mutual exceptions:   643

Act of God, act of war, civil commotions, strikes, lockouts, restraint of princes and rulers,   644
and quarantine restrictions.   645

In addition, any responsibility of the Owners not dealt with in Clause 18(a) shall be   646
subject to the following exceptions:   647

Any act, neglect or default by the Master, pilots or other servants of the Owners in the   648
Navigation or management of the Vessel, fire or explosion not due to the personal fault   649
of the Owners or their Manager, collision or stranding, unforeseeable breakdown of or   650
any latent defect in the Vessel's hull, equipment or machinery.   651

The above provisions shall in no way affect the provisions as to off-hire in this Charter   652
Party.   653

## 20. Insurances   654

(a) *Hull and Machinery* - The Owners warrant that the Vessel is insured for Hull,   655
Machinery and assed War Risks purposes at the value stated in Box 34.   656

(b) *Protection and Indemnity (P & I)* - The Owners warrant that throughout the period   657
of the Charter Party the Vessel will be fully covered for P&I risks, including through   658
transport cover, ~~with underwriters approved by the Charterers which approval shall~~   659
~~not be unreasonably withheld.~~ **P+I name - SHIPOWNERS  (IG GROUP MEMBER)**   660
The Charterers warrant that throughout the period of the Charter Party they will be   661
covered for Charterers' liability risk ~~by underwriters approved by the Owners which~~   662
~~approval will not be unreasonably withheld.~~   663

## 21. War Risks ("Conwartime 1993")   664

(a) For the purpose of this Clause, the words:   665

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners,   666

Managers or other operators who are charged with the management of the   667
Vessel, and the Master; and   668

(ii) "War Risks" shall include any war (whether actual or threatened), act of war,   669
civil war, hostilities, revolution, rebellion, civil commotion, warlike operations,   670
the laying of mines (whether actual or reported), acts of piracy, acts of terrorists,   671
acts of hostility or malicious damage, blockades (whether imposed against all   672
vessels or imposed selectively against vessels of certain flags or ownership, or   673
against certain cargoes or crews or otherwise howsoever), by any person,   674
body, terrorist or political group, or the Government of any state whatsoever,   675
which, in the reasonable judgement of the Master and/or the Owners, may be   676
dangerous or are likely to be or to become dangerous to the Vessel, her cargo,   677
crew or other persons on board the Vessel.   678

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be   679
ordered to or required to continue to or through, any port, place, area or zone   680
(whether of land or sea), or any waterway or canal, where it appears that the Vessel,   681
her cargo, crew or other persons on board the Vessel, in the reasonable judgement   682
of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.   683
Should the Vessel be within any such place as aforesaid, which only becomes   684
dangerous, or is likely to be or to become dangerous, after her entry into it, she   685
shall be at liberty to leave it.   686

(c) The Vessel shall not be required to load contraband cargo, or to pass through any   687
blockade, whether such blockade be imposed on all vessels, or is imposed selectively   688
in any way whatsoever against vessels of certain flags or ownership, or against   689
certain cargoes or crews or otherwise howsoever, or to proceed to an area where   690
she shall be subject, or is likely to be subject to a belligerent's right of search and/   691
or confiscation.   692

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery   693
of the Vessel and their other interests (including, but not limited to, loss of   694
earnings and detention, the crew and their Protection and Indemnity Risks),   695
and the premiums and/or calls therefor shall be for their account.   696

(ii) If the Underwriters of such insurance should require payment of premiums   697
and/or calls because, pursuant to the Charterers' orders, the Vessel is within,   698
or is due to enter and remain within, any area or areas which are specified by   699
such Underwriters as being subject to additional premiums because of War   700
Risks, then such premiums and/or calls shall be reimbursed by the Charterers   701
to the Owners at the same time as the next payment of hire is due.   702

(e) If the Owners become liable under the terms of employment to pay to the crew any   703
bonus or additional wages in respect of sailing into an area which is dangerous in   704
the manner defined by the said terms, then such bonus or additional wages shall   705
be reimbursed to the Owners by the Charterers at the same time as the next   706
payment of hire is due.   707

(f) The Vessel shall have liberty:-   708

(i) to comply with all orders, directions, recommendations or advice as to   709
departure, arrival, routes, sailing in convoy, ports of call, stoppages,   710
destinations, discharge of cargo, delivery, or in any other way whatsoever,   711
which are given by the Government of the Nation under whose flag the   712
Vessel sails, or other Government to whose laws the Owners are subject,   713
or any other Government, or any other body or group whatsoever acting   714
with the power to compel compliance with their orders or directions;   715

(ii) to comply with the order, directions or recommendations of any war risks   716
underwriters who have the authority to give the same under the terms of   717
the war risks insurance;   718

(iii) to comply with the terms of any resolution of the Security Council of the   719
United Nations, any directives of the European Community, the effective   720
orders of any other Supranational body which has the right to issue and   721
give the same, and with national laws aimed at enforcing the same to   722
which the Owners are subject, and to obey the orders and directions of   723
those who are charged with their enforcement;   724

(iv) to divert and discharge at any other port any cargo or part thereof which   725
may render the Vessel liable to confiscation as a contraband carrier;   726

(v) to divert and call at any other port to change the crew or any part thereof or   727
other persons on board the Vessel when there is reason to believe that   728
they may be subject to internment, imprisonment or other sanctions.   729

(g) If in accordance with their rights under the foregoing provisions of this Clause,   730
the Owners refuse to proceed to the loading or discharging ports, or any one or   731
more of them, they shall immediately inform the Charterers. No cargo shall be   732
discharged at any alternative port without first giving the Charterers notice of   733
the Owners' intention to do so and requesting them to nominate a safe port for   734
such discharge. Failing such nomination by the Charterers within 48 hours of   735
the receipt of such notice and request, the Owners may discharge the cargo at   736
any safe port of their own choice.   737

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this   738
Clause anything is done or not done, such shall not be deemed a deviation,   739
but shall be considered as due fulfilment of this Charter Party.   740

## 22. Law and Arbitration   741

*) (a)   This Charter Party shall be governed by and construed in accordance with   742
English law and any dispute arising out of or in connection with this Charter   743
Party shall be referred to arbitration in London in accordance with the Arbitration   744
Act 1996 or any statutory modification or re-enactment thereof save to the   745
extent necessary to give effect to the provisions of this Clause.   746
The arbitration shall be conducted in accordance with the London Maritime   747

**PART II**
**"GENTIME" General Time Charter Party**

| | |
|---|---|
| Arbitrators Association (LMAA) Terms current at the time when the arbitration | 748 |
| proceedings are commenced. | 749 |
| The reference shall be to three arbitrators. A party wishing to refer a dispute to | 750 |
| arbitration shall appoint its arbitrator and send notice of such appointment in | 751 |
| writing to the other party requiring the other party to appoint its own arbitrator | 752 |
| within 14 calendar days of that notice and stating that it will appoint its arbitrator | 753 |
| as sole arbitrator unless the other party appoints its own arbitrator and gives | 754 |
| notice that it has done so within the 14 days specified. If the other party does | 755 |
| not appoint its own arbitrator and give notice that it has done so within the 14 | 756 |
| days specified, the party referring a dispute to arbitration may, without the | 757 |
| requirement of any further prior notice to the other party, appoint its arbitrator | 758 |
| as sole arbitrator and shall advise the other party accordingly. The award of a | 759 |
| sole arbitrator shall be binding on both parties as if he had been appointed by | 760 |
| agreement. | 761 |
| Nothing herein shall prevent the parties agreeing in writing to vary these | 762 |
| provisions to provide for the appointment of a sole arbitrator. | 763 |
| In cases where neither the claim nor any counterclaim exceeds the sum of | 764 |
| USD 50,000 (or such other sum as the parties may agree) the arbitration shall | 765 |
| be conducted in accordance with the LMAA Small Claims Procedure current | 766 |
| at the time when the arbitration proceedings are commenced. | 767 |
| *) (b)   This Charter Party shall be governed by and construed in accordance with | 768 |
| Title 9 of the United States Code and the Maritime Law of the United States | 769 |
| and any dispute arising out of or in connection with this Charter Party shall be | 770 |
| referred to three persons at New York, one to be appointed by each of the | 771 |
| parties hereto, and the third by the two so chosen; their decision or that of any | 772 |
| two of them shall be final, and for the purposes of enforcing any award, | 773 |
| judgement may be entered on an award by any court of competent jurisdiction. | 774 |
| The proceedings shall be conducted in accordance with the rules of the Society | 775 |
| of Maritime Arbitrators, Inc. | 776 |
| In cases where neither the claim nor any counterclaim exceeds the sum of | 777 |
| USD 50,000 (or such other sum as the parties may agree) the arbitration shall | 778 |
| be conducted in accordance with the Shortened Arbitration Procedure of the | 779 |
| Society of Maritime Arbitrators, Inc. current at the time when the arbitration | 780 |
| proceedings are commenced. | 781 |
| *) (c)   This Charter Party shall be governed by and construed in accordance with the | 782 |
| laws of the place mutually agreed by the parties and stated in Box 35 and any | 783 |
| dispute arising out of or in connection with this Charter Party shall be referred | 784 |
| to arbitration at the place stated in Box 35, subject to the procedures applicable | 785 |
| there. | 786 |
| (d) If Box 35 in Part I is not appropriately filled in, sub-clause (a) of this Clause | 787 |
| shall apply. | 788 |
| (a), (b) and (c) are alternatives; indicate alternative agreed in Box 35 | 789 |

**23. Commission**

| | |
|---|---|
| The Owners shall pay a commission at the rate stated in Box 36 to the Broker(s) | 790 |
| stated in Box 36 on any hire paid under this Charter Party or any continuation or | 791 |
| Extension thereof. If the full hire is not paid owing to breach of Charter Party by | 792 |
| either of the parties the party liable therefor shall indemnify the Brokers against | 793 |
| their loss of commission. | 794 |
| Should the parties agree to cancel this Charter Party, the Owners shall indemnify | 795 |
| the Brokers against any loss of commission but in such case the commission shall | 796 |
| not exceed the brokerage on one year's hire. | 797 |
| In signing this Charter Party the Owners acknowledge their agreement with the | 798 |
| brokers to pay the commissions described in this Clause. **The Brokers have the right to** | 799 |
| **ask the Charterers to deduct the commission from the hire or any monies due by the** | 800 |
| **Charterers to Owners in such case the Charterers are responsible for the payment of** | |
| **the commission.** | |

**24. Notices**

| | |
|---|---|
| Any notices as between the Owners and the Charterers shall be in writing and sent | 801 |
| to the addresses stated in Boxes 2 and 3 as the case may be or to such other | 802 |
| addresses as either party may designate to the other in writing. | 803 |
| | 804 |

This document is a computer generated GENTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**"GENTIME" General Time Charter Party**
**Appendix A – Protective Clauses**

### A.  WAR RISKS ("Voywar 1993")

(1) For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons on board the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

### B.  CLAUSE PARAMOUNT

The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 24 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation in the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract, save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals.

### C.  GENERAL AVERAGE

General Average shall be adjusted and settled at a port or place in the option of the Carrier according to the York-Antwerp Rules, 1994 or any subsequent amendment thereto.

### D.  HIMALAYA CLAUSE

It is hereby expressly agreed that no servant or agent of the Carrier (including every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Charterers, Shippers, Consignees, owner of the goods or to any holder of a Bill of Lading issued under this Charter Party, for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment.

Without prejudice to the generality of the foregoing provisions in this clause, every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defence and immunity of whatsoever nature applicable to the Carrier or to which the Carrier is entitled hereunder, shall also be available and shall extend to protect every such servant or agent of the Carrier acting as aforesaid.

For the purpose of all the foregoing provisions of this clause the Carrier is or shall be deemed to be acting as agents or trustees on behalf of and for the benefit of all persons who might be his servants or agents from time to time (including independent contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this contract.

### E.  NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if salving vessel or vessels belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the Carrier before delivery.

### F.  BOTH-TO-BLAME COLLISION CLAUSE

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the vessel, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying vessel or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or Carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect to a collision or contact.

--

This document is a computer generated GENTIME form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.  BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Additional Clauses (PART III) to the Charter Party for the MV "OCEAN FORCE" dated Versailles, 1st August 2019

**Clause 25 – Release of Charter Party Details to Third Party**

All negotiations/fixture to be kept strictly private and confidential.

**Clause 26 – Description**

**SHIP'S PARTICULARS**
Name: Ocean Force Owner: Redbrick Ventures Ltd.,
Call sign: V3WI7 Drake Cambers,Road Town,
Built: Husum, 1983 Tortola, BVI.
Yard No.: 1482 Husumer Schiffswerft
Flag/Port of registry Belize/Belize City
Official No.: 731482
IMO No.: 8215613
GL No.: 30398
MMSI No.: 312666000
INM-C No.: 431266611/431266610 Freeboard from deck line(H/C CLOSED): INM Mini-M Voice No.:
870-765-039223 Tropical: 1205mm Deck line=6,02m INM Mini-M Fax No.: 870-761-134328
Summer: 1205mm FW Allowance=100mm Winter: 1205mm Summer draft: 4,82m
E-Mail oceanforce@skyfile.com WNA: 1205mm
Class: Ro-Ro ship, Semi-submersible
equipped for Containers Freeboard from deck line(H/C OPENED):
Classification : Germanischer Lloyd;+100 A5 Tropical: 2415mm Deck line=6,02m SUEZ PANAMA
Summer: 2490mm FW Allowance=75mm
GRT: 6705 6796,71 6962 Winter: 2565mm Summer draft: 3,53m
NRT: 2011 6051,38 6107 WNA: 2615mm
DWT: 4374 Open sky: 2030
LOA: 106,11 LBP: 99,65m
Breadth: 19,6 BOA: 20,42m
Moulded depth: 10,95m Tanks capacities
Summer draft: 4,82 Open sky: 3,53 IFO: 462mts FW: 98mts
Light ship: 2979 w/o h/covers: 2725 MGO: 58mts BW: 7195mts
Air draft above keel: 35,00m To radar mast: 31,75m
Depth(CGO DECK): 5,01m Upper deck: 10,95m
Holds/hatches: 1.1 Hold cubic breakdow 370.000cbf bale 10,487cbm
Hatch type: Single box Container capacity: 452TEU(see remark)
H/covers type: MACOR, PICK-A-PACK system Hold: 228TEU(w/o stack cones) Upper deck: 224TEU
25/40mts
Hold dimensions(LxBxH)
Garage deck: 85,5x14,92x7,80m
Cranes 2 x 63 t on starboard side
Upper deck: 86,60x15,00m
Hatch covers (LxBxH)
HC No. 1,2,3,4,5,6: 12,54x15,00x0,90m Weight: 38mt
HC No.7 10,67x15,00x0,90m Weight: 32mt Total weight: 260mt
Weight:
Weight: Total weight:
Deck strength: Stackweight contaner 20'/40':
Garage= 10,00t/m 60/90tons
Tween deck=

**Additional Clauses (PART III) to the Charter Party for the MV "OCEAN FORCE" dated Versailles, 1st August 2019**


Upper deck= 1,27t/m 25/40tons
Engine: MAK 6M 453AK- 1470kW x 2 no ponton tween deck on board
Bow truster: 300kW vessel can carry 2-3 teu with own equipment


Generators: 130kW x 2


Shaft generator: 300kW
speed abt 10 kn on abt 9 mts IFO30 cst. Port idle consumption 1,3 mts mgo.
with one crane working 16 hours 3 mts mgo, 2 cranes working 16 hours 5 mts mgo
vessel burns mgo whn manoevering/navigation in confined waters/rivers/estauries/canals
and in/out of ports or when swell does not allow to use shaft gens


The aforementioned speed and consumption warranties are applicable only on "good weather days"
of wind force not exceeding force 2 of Beaufort scale and sea state conditions not exceeding force 2
of Douglas scale free of adverse swell and adverse current. It is understood that the above speed /
consumption warranties are not applicable during bad weather days


No extrapolation ofperformance calculations to be made for bad weather period
vessel have no container shoes in low hold, so any containers loaded under deck shall be secured as
usual general cargo. Container lashing as on board for part of the container intake
final bunker intake is upto master descretion but always upto max 90% of max intake
fuel supplyed by the charterers shall comply with iso 8217 -2010 specs


vsl is equipped with a straight stern ramp leading into her garage.
there is no roro connection (such as an elevator or a ramp) fm her garage to her upper deck. The
garage can be reached by the stern ramp or by vsls derricks or by shore gear.
the upper deck can be served by vsls derricks or by shore gear.
stern ramp capacity 650 mts repeat 650 mts.
ramp dims 10.5m lenght x 15.0m width.(but with usuable width of 13.0m only).


In case of need vessel can sail with open hatches with no height limits, except stabilty. dwcc with
closed hatches roughly 3500-3700 mts subject to trim stability
dwcc with open hatches abt 1400 mts subject to trim stability


all details about given in good faith but without guarantee


Owners confirm that vessel's stability allows upto 450 MT deck cargo (2 container tiers) with empty
holds


Owners hereby confirm that 11 reefer plugs among the 20 reefer plugs on main deck are already in
full working condition as from delivery of the vessel.


Within 30 days from delivery of the vessel, the Owners will do their best to have the all 20 reefer
plugs on main deck working in full condition at Chartereurs disposal


Then Owners undertake to do their best efforts to increase the reefer plugs capacity upto 30 (thirty)
(ie Owners to add 10 plugs on top of the original 20 plugs of main deck) as from 1st december 2019


In any case Owners/Vessel to be responsible for the condition and maintenance of the reefer plugs
during the charter party (see clause 18a iii (5))


Only eventual consumption of MGO for a power pack if used for the purpose to increase the reefer
plugs capacity to be for charterers account.

Additional Clauses (PART III) to the Charter Party for the MV "OCEAN FORCE" dated Versailles, 1st August 2019

## Clause 27- Bunkers on delivery and on redelivery

The Charterers on delivery shall take over only the bunkers complying with 0.1% ECA regulations remaining on board the vessel and the Owners on redelivery shall take over for the same quality of bunkers remaining on board the vessel.

The quantities on redelivery shall be more or less the same as the quantities as on delivery. Only the minor difference to be settled at time of redelivery with unit price to be the one paid by the Charterers (excluding barging) at last bunkering port before the redelivery

## Clause 28 – Fuel in tanks

The Owners warrant that the Vessel is suitable for the carriage on deck only of vehicles with fuel/gasoline in their tanks and batteries connected.

## Clause 29 - Cargo Import-Export Permits/Taxes and/or Dues

Customs' and security clearance, export and/or import permits for cargo to be at Charterers risk and expense.

Taxation or levies, whatsoever for these purposes, to be for Charterers account and to be paid by Charterers.

Any taxes and/or dues on the cargo and on the freight arising out of cargoes or ports visited under this Charter shall be for Charterers account.

Any unlawful and/or illegal merchandise and/or goods pertaining to the cargo found inside trailer/containers/cars/unit loads/passengers are solely Charterers' responsibility and all resulting consequences are to be borne by Charterers.

## Clause 30 - Lashing Equipment

The Vessel to be delivered with a full set of supplier certified lashing/securing material to carry the full capacity of trailers as per Vessel's description and complying with the Vessel's Cargo Securing Manual. However trailer trestles are not available and shall be provided by the Charterers at their cost. Such equipment to be in good working condition on delivery and during the currency of the charter Owners to replace/repair material when worn out due to normal wear and tear.

The vessel to be redelivered with the same quantities and type of lashing/securing material. The Charterers to be responsible for damages to lashing/ securing materials and trailer trestles caused by cargo stevedores/ Charterers servants. The Charterers are to replace/repair same at their expense.

Damages/lost items have to be reported by the Master to the Charterers or their agents, in writing, within 72 hours after relevant occurrence as far as possible.

The Master is to keep a record of any Charterers gear/equipment supplied to the Vessel redelivering such gear/equipment to Charterers at the expiry of the charter period. Charterers gear/equipment is put on board the Vessel at Charterers time and expense and the Vessel is not responsible for the maintenance or shortages of such gear/equipment.

Additional Clauses (PART III) to the Charter Party for the MV "OCEAN FORCE" dated Versailles, 1st August 2019

Owners confirm the lashing equipment is available on board as follows

**Судно/Ship "Ocean Force"**          **Дата/Date "30" June 2019**

| № № | Наименование / items | Кол-во/ Qtty | Состояние/ Condition | Номер сертификата/ Certificate No. |
|---|---|---|---|---|
| 1. | Wire Clip Cast Iron Standard 19mm | 1230 | 100% | Не имеется |
| 2. | Wire Clip Cast Iron Standard 22mm | 1230 | 100% | Не имеется |
| 3. | Base twistlock for deck shoes | 178 | 50 % | Не имеется |
| 4. | Twistlock frontal between containers | 300 | 50 % | Не имеется |
| 5. | Bridge fitting | 105 | 50 % | Не имеется |
| 6. | Chain spanners | 165 | 50 % | Не имеется |
| 7. | Lashing chain – 5mtr | 92 | 70 % | Не имеется |
| 8. | Lashing chain – 2,5mtr | 80 | 50% | Не имеется |
| 9. | Lashing chain - china | 110 | 70% | Не имеется |
| 10. | Lashing chain china 6M set | 75 | 60% | имеется |
| 11. | Wire rope 22 mm | 200 | good | Не имеется |
| 12. | Wire rope 19 mm | 100 | good | Не имеется |
| 13. | Wire rope 16 mm | 100 | good | Не имеется |
| 14. | Wire rope 18 mm | 200 | 50 % | Не имеется |
| 15. | Turnbuckles SWL 9.7 T | 100 | 50 % | Не имеется |
| 16. | Turnbuckles SWL 7 T | 20 | 50 % | Не имеется |
| 17. | Turnbuckles SWL 49 T | 30 | 50 % | Не имеется |
|  | For lashing hatch covers in rest position |  |  |  |
| 18. | Slings D 26 mm L 3.7m | 2 | good | Не имеется |
| 19. | Slings D 26 mm L 5.0m | 4 | good | Не имеется |
| 20. | Slings D 26 mm L 5.2m | 4 | good | Не имеется |
| 21. | Slings D 26 mm L 6.0m | 4 | good | Не имеется |
| 22. | Slings D 26 mm L 6.8m | 4 | good | Не имеется |
| 23. | Slings D 26 mm L 8.7m | 2 | good | Не имеется |
| 24. | Slings D 26 mm L 5.0m | 2 | 50 % | Не имеется |
| 25. | Shackles SWL 9.5 T | 40 | 50 % | Не имеется |
| 26. | Turnbuckles SWL 10 T | 22 | 50 % | Не имеется |
|  | For lifting hatch covers |  |  |  |
| 27. | Slings D 36 mm L 12.0m | 4 | good | Не имеется |
| 28. | Shackles SWL 25 T | 4 | 50 % | Не имеется |

Additional Clauses (PART III) to the Charter Party for the MV "OCEAN FORCE" dated Versailles, 1st August 2019

### Clause 31 - Cargo Inside Vehicles and/or Containers

Securing of cargo inside Vehicles, containers and other unit loads to be entirely Charterers concern and responsibility.

Owners shall in no case be responsible for claims and consequences arising from bad stowage of cargo inside the Vehicles, containers and other unit loads. Any damage to the Vessel, her tackle, apparel, furniture or else resulting from insufficient securing of cargo in Vehicles, containers and/or other unit loads shall be repaired at Charterers time and expenses. Under no circumstances are Owners responsible for the shipment of defective unit loads.

Charterers shall be responsible for the information given to the Master as regards aggregate weight of Vehicles, containers and other unit loads for stowing and trimming purposes and Charterers to be responsible for any consequences, delays and expenses as may arise in port or at sea from discrepancies between informed and actual weight of unit loads.

Any unlawful and/or illegal merchandise and/or goods pertaining to the cargo found inside Vehicles/containers/unit loads are solely Charterers responsibility and all resulting consequences are to be borne by Charterers.

### Clause 32 - Flag/Class

Owners are not allowed to change the Flag/the Classification Society during the currency of this Charter

### Clause 33 - Certificates

Owners represent and warrant that at the time of delivery and at all times during the currency of this charter all the vessel's statutory and class certificates shall be fully valid and in force without restrictions/limitations under Vessel's flag regulations and the validity of such certificates during the Charter Period shall be on Owners' account and responsibility.
The time while the Vessel is unable to effect the service due to any deficiency or withdrawal of the Vessel's actual statutory and class certificates/Documents shall be considered off-hire.

### Clause 34 - Bunker Fuel Sulphur Content Clause

(a) For the purpose of this Clause, "Sulphur Content Requirements" means any sulphur content and related requirements as stipulated in MARPOL Annex VI (as amended from time to time) and/or by any other applicable lawful authority.

(b) The Charterers shall supply fuels to permit the Vessel, at all times, to comply with any applicable Sulphur Content Requirements. All such fuels shall meet the specifications and grades set out in this Charter Party.
The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers shall comply with the Sulphur Content Requirements.

The Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all losses, damages, liabilities, delays, deviations, claims, fines, costs, expenses, actions, proceedings, suits, demands arising out of the Charterers' failure to comply with this subclause (b), and the Vessel shall remain on hire throughout.

Additional Clauses (PART III) to the Charter Party for the MV "OCEAN FORCE" dated Versailles, 1st August 2019

(c) The Owners warrant that the Vessel shall comply with the Sulphur Content Requirements.

Subject to the Charterers having supplied the Vessel with fuels in accordance with subclause (b), the Charterers shall not otherwise be liable for any losses, damages, liabilities, delays, deviations, claims, fines, costs, expenses, actions, proceedings, suits, demands arising out of the Owners' failure to comply with this subclause (c).

**Clause 35 - Bunker Quality Control Clause**

(1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

(2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

(3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

(4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis ofthe sample(s) by SGS or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

**Clause 36 - Lien Clause**

In addition to the right of lien conferred on the Owners according to the provisions of the charter-party lien clause, the Owners also to have a lien over bunkers on board, as well as over any sums due to Time Charterers under any sub-charterparties (in addition to freights and sub- freights), for any amounts due under this charter-party. Further, in the event of the Owners' exercise of their liberty to withdraw the vessel in accordance with the provisions of the charter-party withdrawal clause, the ownership of any bunkers remaining on board shall thereupon vest in Owners, who shall allow to Time Charterers by way of credit against any sums due to Owners the value of such bunkers calculated in accordance with the provisions of the charter-party bunkers clause applicable on redelivery.

**Clause 37 - Confirmation  of payment D/A, bunker supply.**

It's Charterers' obligation to provide Owners at their request with the following:
-Upon sailing each port while T/C period, the agent will confirm directly to Owners in written that D/A due vessel's call has been paid in full.

Additional Clauses (PART III) to the Charter Party for the MV "OCEAN FORCE" dated Versailles, 1st August 2019

-Within max 30 days after bunkering Charterers will provide Owners with clear evidences that bunker delivered on board has been actually paid.
Such evidences shall include swift confirmation, Supplier's Payment receipt.

### Clause 38 – Cargo on board at time of delivery

Due to the fact that vessel was clean fixed after completion of discharging under her previous voyage, vessel wll have a small cargo (redusing cargo intake) consisting of (2 x 40' containers + 1x 20' flt racj 14 feet height + 2 desicant frames 240x96x162 inches ) on board on delivery of the vessel under present charterer party.
The described small cargo above will be discharged after the delivery of the vessel at first opportunity at Owners time and account.

### Clause 39 – Anti-Drug Abuse

In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

### Clause 40 – Stowaways

If stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers or by any other means related to the cargo operation, this shall amount to breach of charter. The Charterers shall be liable for the consequences of such breach and hold the Owners harmless and keep them indemnified against all claims; costs (including but not limited to victualling costs for stowaways whilst on board and repatriation); losses; and fines or penalties, which may arise and be made against them. The Charterers shall, if required, place the Owners in funds to put up bail or other security. The Vessel shall remain on hire for any time lost as a result of such breach.

| The Owners | | The Charterers |
|---|---|---|
| | | |
| | | |
| | | |